```
1              IN THE UNITED STATES DISTRICT COURT
2                   FOR THE EASTERN DISTRICT
3                      NORTHERN DIVISION
4
5      UNITED STATES OF AMERICA,    )
6                                   )
7                Plaintiff,         )
8                                   )  No. 3:04-cr-179
9           vs.                     )  Knoxville, Tennessee
10                                  )  March 28, 2008
11     GREGORY ALEC PHILLIPS,       )  2:00 p.m.
12                                  )
13               Defendant.         )
14
15
16             TRANSCRIPT OF REVOCATION HEARING
17          BEFORE THE HONORABLE THOMAS W. PHILLIPS
18               UNITED STATES DISTRICT JUDGE
19
20     APPEARANCES:
21     For the Plaintiff:      CHARLES E. ATCHLEY, JR., ESQ.
22                             United States Attorney
23                             Department of Justice
24                             800 Market Street, Ste. #211
25                             Knoxville, Tennessee
26
27     For the Defendant:      HALLIE McFADDEN, ESQ.
28                             McFadden & Stuart, PLLC
29                             1010 Market Street, Ste. #400
30                             Chattanooga, Tennessee
31
32
33     _____
34                  LYNDA CLARK, CCR, RPR, RMR
35                MILLER & MILLER COURT REPORTERS
36             12804 Union Road, Knoxville, Tennessee
37          Phone: (865) 675-1471 / FAX: (865) 675-6398
```

1                          INDEX

2    WITNESS                                      PAGE

3    TIM CHAVERS

4          Direct Examination by Mr. Atchley        7

5          Cross-Examination by Ms. McFadden        61

6

7

8                    GOVERNMENT EXHIBITS

9    NO.    DESCRIPTION                          PAGE

10   1      Judgment & Commitment Order            12

11   2      Polygraph Report                       46

12   3      Letter from Dr. Glennon                49

13

14                     DEFENSE EXHIBITS

15   NO.    DESCRIPTION                          PAGE

16   1      E-mail                                 66

17   2      U.S. Probation Supervision Blank Report   73

18   3      Letter (12/7/07                        74

19   4      Brandon Raulston Affidavit             87

20   5      Letter from C. Harkins                 88

21

22

23

24          (Note:  Unless provided to the court reporter, all

25           all names are spelled to the best phonetic

26           approximation.)

27

1          This cause came on for hearing on the 28th

2     day of March, 2008, in the United States District Court

3     for the Eastern District of Tennessee, Northern

4     Division, before the Honorable Thomas W. Phillips,

5     presiding.

6          The Court having been duly opened, the

7     following proceedings were had, to-wit:

8          THE COURTROOM DEPUTY:  All rise.  United

9     States District Court for the Eastern District of

10    Tennessee is now open pursuant to adjournment with the

11    Honorable Thomas W. Phillips, preceding.

12         Please, come to order and be seated.

13         THE COURT:  Well, good afternoon, ladies and

14    gentlemen.

15         Madam Clerk, if you will call the next case

16    for us, please.

17         THE COURTROOM DEPUTY:  This is a Revocation

18    Hearing in case 3:04-cr-179, United States of America

19    versus Gregory Alec Phillips.

20         Here on behalf of the Government is Charles

21    Atchley.

22         Is the Government ready to proceed?

23         MR. ATCHLEY:  Present and ready, Your Honor.

24         THE COURTROOM DEPUTY:  Here on behalf of the

25    defendant is Hallie McFadden.

1                    Is the defendant ready to proceed?

2              MS. McFADDEN:  Yes, Your Honor.

3              THE COURT:  Okay.  Mr. Phillips, this is a

4        Revocation Hearing that's being held pursuant to Rule

5        32.1 of the Federal Rules of Criminal Procedure.

6                    If you would please raise your right hand for

7        me.

8              THE COURTROOM DEPUTY:  Do you solemnly swear

9        or affirm that you will truthfully answer all questions

10       asked of you at this time and you shall answer under

11       God.  If so, please say I do.

12             THE DEFENDANT:  I do.

13             THE COURTROOM DEPUTY:  Thank you.  And you

14       may be seated.

15             THE COURT:  Mr. Phillips, will you please

16       state and spell for the record your full name.

17             THE DEFENDANT:  Yes, sir.  My name is Gregory

18       Alec Phillips.  It's G-r-e-g-o-r-y, A-l-e-c,

19       P-h-i-l-l-i-p-s.

20             THE COURT:  And how old are you,

21       Mr. Phillips?

22             THE DEFENDANT:  I'm 39 years old.

23             THE COURT:  How far did you go in school?

24             THE DEFENDANT:  I completed a Bachelor's

25       Degree and some post graduate work.

1            THE COURT:  So I take you it you have no

2     difficulty reading or writing, is that correct?

3            THE DEFENDANT:  Yes, sir.

4            THE COURT:  Now, Mr. Phillips, on

5     September 28th, 2005, you appeared with your counsel in

6     court and you were sentenced to 37 months' imprisonment

7     followed by a life-time term of supervised release.

8            A Petition for Revocation of Supervised

9     Release has been filed in your case.  The alleged

10    violations include having third-party contact with the

11    victim, associating with a felon, associating with

12    known sex offenders and/or individuals known to engage

13    in criminal sexual activity with children under 18

14    years of age, failing to disclose third-party risk as

15    instructed, failing to be truthful in sex offender

16    treatment, failing to be truthful with a probation

17    officer, failing to follow the instructions of your

18    probation officer and falsifying monthly report forms.

19            Now, Mr. Phillips, you're going to be

20    represented in this case by Miss Hallie McFadden, is

21    that correct?

22            THE DEFENDANT:  Yes, sir.

23            THE COURT:  And, Miss McFadden, I take it

24    that you are willing to represent Mr. Phillips for his

25    Revocation Hearing?

1          MS. McFADDEN:  Yes, I am, Your Honor.

2          THE COURT:  Okay.  Thank you, Miss McFadden.

3          Now, Miss McFadden, what is the defense

4     position in regard to the Petition for Revocation?

5          MS. McFADDEN:  Your Honor, we actually do not

6     concede the violations.  We believe that there may be

7     -- may be -- one or two technical violations; however,

8     we believe the rest of the allegations are not

9     violations of his probation of the supervised release.

10          THE COURT:  Well, thank you, Miss McFadden.

11          And, Mr. Atchley, are you ready to proceed

12     with your proof?

13          MR. ATCHLEY:  Yes, sir, I am.

14          THE COURT:  Let's have all the witnesses that

15     are going to testify please stand at this time and be

16     sworn.

17          THE COURTROOM DEPUTY:  Do you solemnly swear

18     or affirm that the testimony you will give in the

19     matter before the Court today will be the truth, the

20     whole truth and nothing but the truth, so help you God?

21     If so, please say I do.

22               (Prospective witnesses were

23                    administered the oath.)

24          MR. ATCHLEY:  Your Honor, actually the United

25     States is going to proceed just with Mr. Chavers.  I

26     out of an abundance of caution had the others sworn

1       just in case but don't anticipate using them.

2                  THE COURT:  Would you like to have them

3       excluded under the exclusionary rule, Miss McFadden?

4                  MS. McFADDEN:  Yes, Your Honor, please.

5                  THE COURT:  Okay.  Please, remain outside of

6       the courtroom until you are called to testify.

7                  And, of course, you are required not to

8       discuss your testimony with anyone or allow anyone to

9       discuss it with you until you have completed your

10      testimony in this case.

11                 Okay.  Mr. Atchley, you may proceed.

12                 MR. ATCHLEY:  Thank you, Your Honor.

13                 The United States calls Probation Officer

14      Chavers.

15                 THE COURT:  Okay.  Mr. Chavers.

16                       TIM CHAVERS,

17                  having been called as a witness herein,

18                  having been previously duly sworn, was

19                  examined and testified as follows:

20                 THE COURT:  You may proceed when you are

21      ready, Mr. Atchley.

22                 MR. ATCHLEY:  Thank you, Your Honor.

23                       DIRECT EXAMINATION

24      BY MR. ATCHLEY:

25      Q    Mr. Chavers, would you state your name for the

1       record, please.

2       A       My name is Tim Chavers.

3       Q       And where are you employed, sir?

4       A       I'm employed with the United States Probation

5       Office, Chattanooga, Tennessee.

6       Q       And how long have you been employed there?

7       A       I've been a Federal Probation Officer since 1995.

8       Q       All right.  So I take it you're a federal

9       probation officer.  Could you very briefly tell us what

10      that job entails and what some of your duties are.

11      A       My job is to supervise people who come out to

12      supervision that were sentenced to a term of supervised

13      release and/or probation by the Courts.

14              When the Court imposes conditions on individuals,

15      my job is to ensure that they comply with those

16      conditions and notify the Court if they don't.

17      Q       Okay.  And do you have a specialty with regard to

18      this supervision?  Are there types of offenders that

19      you specialize in?

20      A       Yes, I do.  Since 2002 I have been -- I've been

21      the Mental Health Specialist in Chattanooga since 2002.

22      I supervise all the sex offenders assigned to the

23      Chattanooga office and the most severe mental health

24      cases.

25      Q       Okay.  And during the course of your duties as a

1    probation officer here in the Eastern District of

2    Tennessee has Mr. Gregory Alec Phillips been a

3    probationer or supervised releasee on your caseload?

4    A    Yes, he has.

5    Q    And do you see him here in the courtroom today?

6    A    Yes, I do.

7    Q    The gentleman sitting over here at counsel table?

8    A    That's correct.

9    Q    And when did you have an opportunity to begin

10   supervising Mr. Phillips?

11   A    He was released from the Bureau of Prisons'

12   custody on August 15th.  He reported to my office

13   August 16th, 2007, for his initial office meeting.

14   Q    Okay.  And very briefly could you tell us what

15   took place in that initial meeting.

16   A    When someone comes in to see their probation

17   officer for the first time, we go over the conditions

18   of the supervision that are imposed by the Court.  We

19   read those conditions to the individual.

20        We will explain them -- ask them if they have any

21   questions about any of those.  We will explain any

22   conditions we feel like need to be explained.

23   Q    Okay.  Did you fully explain all the conditions of

24   his supervised release to him?

25   A    Most people when they come in the first time for

1    their initial office visit -- it takes us anywhere from

2    30 minutes to an hour to go over their conditions.

3        Mr. Phillips was in my office for well over two

4    hours.  We had a very long discussion that day about

5    his conditions because of the nature of his conviction

6    and because of the numerous conditions that he has.

7    Q    Okay.  And did he appear to understand what the

8    conditions of his supervised release were?

9    A    There were -- There was one condition in

10   particular that he asked a lot of questions about.  It

11   was third-party risk.  And he wanted to know exactly

12   what he needed to disclose with regard to that

13   condition because he commented that if he disclosed his

14   offense to people that he was trying to get a job with,

15   they may not want to hire him.

16       I advised him that that was part of the

17   consequence of his conviction.  And I made it very

18   clear to him that he was to disclose to anyone with

19   whom he rented an apartment, with anyone for whom he

20   worked or anyone that he dated that he was a convicted

21   sex offender -- convicted registered sex offender.  He

22   was to tell them exactly what he was on supervision

23   for.  And I told him he should read it verbatim from

24   his J & C, which is the Judgment Commitment Order.

25   Q    Did he acknowledge that he understood all the

1    conditions?

2    A    He did.

3    Q    And he acknowledged that in writing?

4    A    He signed the conditions, indicating that he

5    understood them and that he would comply.

6            MR. ATCHLEY:  Okay.  Your Honor, at this time

7    may I approach the witness, please?

8            THE COURT:  You may.

9    BY MR. ATCHLEY:

10    Q    If you could, please, Mr. Chavers, could you

11    identify for the Court the document that I've given you

12    there.

13    A    This is a copy of his Judgment and Commitment

14    Order.

15        And when people come in who are subject to a term

16    of supervised release, we give them a copy of their

17    Judgment Commitment Order.  And we read to them

18    ourselves the conditions of supervision -- the special

19    conditions of supervision, and then we have them sign

20    and acknowledge it.

21    Q    Okay.  And did Mr. Phillips do that?

22    A    He did.

23    Q    And is that acknowledged on that document I gave

24    you?

25    A    It is.

1          MR. ATCHLEY:  Okay.  At this time, Your

2    Honor, I would move it into evidence as Government's

3    Exhibit No. 1.

4          THE COURT:  It will be received.

5          (Government's Exhibit No. 1 was admitted.)

6          MR. ATCHLEY:  Thank you, Your Honor.

7    BY MR. ATCHLEY:

8    Q    Now, I believe you testified, Mr. Chavers, that

9    you began supervision September 16th, I believe?

10   A    August 16th, 2007.

11   Q    August 16th, 2007.

12        If you could please tell us exactly, briefly, what

13   this supervision entailed.  How often would you begin

14   to see Mr. Phillips and what are some of the things you

15   did in the supervision?

16   A    Well, during our first meeting I made clear to him

17   that he was considered a high-profile, high-risk case

18   to us simply because he was a two-time convicted child

19   predator.

20        I also let him know that he was expected to fully

21   comply with the conditions and that if he had any

22   questions whatsoever about those conditions, he should

23   contact me and ask me.

24        I made it very clear to him that day that

25   truthfulness was essential for him and that he was to

1    be honest.  He indicated he understood.

2         On August 17th I went by his -- the place where he

3    was living.  It was the In-Town Suites in Chattanooga.

4    I went to verify that he had disclosed third-party risk

5    to the manager there.

6         When I spoke to the manager, she indicated that

7    she remembered Mr. Phillips, but he did not tell her

8    that he was a sex offender.  She was shocked by that.

9         I disclosed to her what he was on supervision for.

10   I disclosed to her what the offense involved, the

11   basics of the offense, and asked her to call me if she

12   had any questions.

13        I then went to talk to Mr. Phillips about it.  He

14   was not there.  I did find him at the residence on

15   August 20th.  And when I went to see him that time, his

16   father was there when I first got there.  We chatted

17   for a few minutes.  His father then left.

18        And I let Mr. Phillips know that when I talked to

19   the apartment manager of the In-Town Suites, she did

20   not know that he was a sex offender.  I let him know

21   that I disclosed that to her and asked her to call me

22   if there were any problems.

23        I also made it very clear to him that day that he

24   should take third-party risk disclosures seriously and

25   that if he didn't, then there would be consequences for

1    that because of the nature of his case.

2    Q    Okay.  Did he appear to understand that

3    completely?

4    A    He did.  I also let him know that I was not going

5    to be charging that as a violation since he had checked

6    into the facility before I went over the conditions,

7    but I warned him that if that type of thing happened

8    again, then he would be charged with a violation.

9    Q    Okay.  Now, how often would you get to see

10    Mr. Phillips when he was under your supervision, and

11    how often would he come into the office, and what are

12    some of the procedures behind that supervision?

13    A    I didn't give any set time to come see me.  I did

14    put him -- He had a condition that he submit to drug

15    screens -- random drug screens.  So I put him in our

16    code-a-phone system, and he was required -- At a

17    minimum he was going to have to report to the office

18    monthly.  We had multiple telephone contacts.  Most of

19    our contacts early on were telephone.

20        I went by the residence on the 20th.  And then he

21    would call me to keep me informed about what he had

22    done as far as compliance with the TBI Sex Offender

23    Registry and his pursuit of a job.

24        I would call him from time to time just to check

25    on his progress and how he was doing.

1    Q    Okay.  Did supervision with Mr. Phillips go okay

2    through August?

3    A    It appeared to me like it was going well.

4    Q    September?

5    A    Excellent.

6    Q    October?

7    A    Excellent.

8    Q    When did you begin to have some problems -- some

9    compliance problems with Mr. Phillips?

10   A    The first time I had any real suspicions about

11   whether something was not right was on December 11th,

12   2007.

13        He had obtained employment at a law firm in

14   Chattanooga as a paralegal.  And my supervisor and

15   myself went by to do an unannounced employment visit.

16   Q    Surprise visit?

17   A    Surprise visit.

18        When we got there, we asked him to show us where

19   his office was.  He had a computer in there.  And we

20   asked him if he would -- if he used that computer for

21   any personal business.

22        He admitted that he used it to e-mail friends and

23   family.  We asked him who he would e-mail, and he told

24   us it was his father, friends, family, that kind of

25   thing.  He did disclose that he had contact -- e-mail

1      contact with a friend of his in Thailand.

2      Q    Is this the first time you ever heard of this?

3      A    Yes.

4      Q    What did he say about this friend in Thailand?

5      A    Well, needless to say, since he had committed his

6      offense in Thailand when myself and my supervisor heard

7      him say he was communicating with somebody in Thailand,

8      that perked up our attention a little bit.

9      We asked him -- My first thought was is this his

10     victim.  And I asked him, "Have you had any contact

11     with your victim?"  He adamantly denied that, direct or

12     indirect.

13     I also asked him if his friend was a felon, and

14     he said not to his knowledge.  He was not a felon.  He

15     described his friend as a British national who was

16     approximately 42 years old, who was an upstanding,

17     law-abiding citizen, and that to his knowledge he was

18     not anyone who had any criminal past or --

19     We even asked him if he was a sex offender,

20     whether or not he was someone who engaged in sexual

21     activity with children under 18.  And he said not to

22     his knowledge.

23     We pressed him on that and said, "You're saying

24     not your knowledge."  And he said, "No".  When -- We

25     spent quite a bit of time with him talking about this.

1    Q    What is quite a bit of time?

2    A    We were at his office I would say close to an

3    hour -- 45 minutes to an hour.

4    And we wanted it to be very clear to him that we

5    were concerned about this friend in Thailand.  We asked

6    him repeatedly if he knew whether or not he was a

7    felon, whether or not he was a sex offender, whether or

8    not he had contact with his victim.  He maintained,

9    "No".

10    We pressed him enough that he got pretty agitated.

11    He started defending himself, telling me how he had

12    done everything he was supposed to do.  He had been to

13    all his drug screens.  He had gone to treatment like he

14    was supposed to, he found a place to work, he found an

15    apartment and that he was trying to comply with his

16    conditions.

17    So much so that I wanted him to know as far as I

18    knew there was nothing that he had done that was a

19    violation of his supervision.  And I stressed to him

20    that if he's telling me the truth about his friend in

21    Thailand, then that's fine.

22    We didn't tell him to break that relationship off

23    with his friend.  We made it very clear to him that we

24    had concerns about that.

25    He even -- When he became agitated and talked

1    about how well he had done, I commended him.  I said,

2    "You have done well.  And if you're telling me the

3    truth about all this, that's fine."

4        I was letting him know he had shown up as he

5    should for all his appointments, so on, so forth.

6    Q    Did he ask you to do something as a result of that

7    meeting?

8    A    He did.  He asked me if I would put that in

9    writing.  And I said, "I'd be happy to put that in

10   writing, Greg," I said, "but you need to understand

11   something.  It's only good up to the point I sign.  If

12   I find out later that you've lied to me, it doesn't

13   mean a thing."  He said he understood.

14   Q    Okay.  What happened as December went on?

15   Anything else come up with regard to Mr. Phillips?

16   A    On December 19th I got a phone call from --

17       Let me backtrack just a second.  I want to make

18   one thing clear.  This issue with him having contact

19   with a felon -- We asked him that repeatedly on

20   December 11th, if he had had contact with anybody he

21   knew to be a felon.

22   Q    Not just Mr. Phillips?

23   A    Not just -- We didn't even know the guy's name at

24   that point.  I didn't ask him his name at that point.

25       We asked him if he had contact with anybody he

1    knew to be a felon or sex offender or someone engaged

2    in criminal activity or someone engaged in sex with

3    little children, children under 18.  We stressed that

4    point.  And he said, "No".

5    On December 19th --

6    Let me add one more thing.  He even commented that

7    the only people that he had had contact with who he

8    knew to be felons, sex offenders or people who liked

9    children since his release were the individuals that

10    were in his treatment program with Dr. Bertin Glennon

11    at the Center for Individual Family Effectiveness.

12    Q    In other words, individuals that he was authorized

13    to be around?

14    A    Exactly.

15    On December 19th I received a phone call from FBI

16    Agent Wayne Jackson in Chattanooga.  He told me that he

17    had just gotten off the phone with an attorney who said

18    that Mr. Phillips had contacted him about providing

19    information on a Top Ten FBI fugitive who had been out

20    of the country for years that they were looking for.

21    I advised Mr. Jackson that that was news to me

22    because we had seen Mr. Phillips just about a week

23    before that and that he had adamantly denied any

24    contact with anybody he knew to be a felon.

25    Q    Did he mention this fugitive to you in that

1    meeting at all?

2    A    He did.  He told me the name of the fugitive was

3    Jon Schillaci.

4    Q    Had Mr. Phillips ever mentioned this to you before

5    you heard it from Agent Jackson --

6    A    He had not.

7    Q    -- in any prior meeting, put it on any monthly

8    report --

9    A    He did not.

10   Q    -- in any way at all communicate it to you?

11   A    It was a great surprise to me on December 19th.

12   Q    Okay.  So please go on.  What happened in this

13   meeting?

14   A    During that meeting I let the FBI agent know

15   that -- Well, he told me that through the attorney he

16   had been told that Mr. Phillips wanted to provide

17   information on the whereabouts of this fugitive who was

18   living in Mexico and that he would be willing to do

19   that conditionally.

20        And according to the FBI agent Mr. Phillips wanted

21   the reward money and he wanted -- and what Mr. Jackson

22   told me was he wanted off supervision.

23        I let Mr. Jackson know that I didn't think the

24   Court would allow that, I didn't think that the U.S.

25   Attorney would allow that, but that obviously in that

1  situation if Mr. Phillips wanted to cooperate with the

2  Government, he would have to get permission from the

3  Court before he could do that.

4  And I told Mr. Jackson that I was quite sure that

5  Mr. Phillips knew that because he goes out of his way

6  to show that he understands his conditions and that

7  he's complying with them.

8  I offered to the FBI agent that day to call

9  Mr. Phillips to the office immediately and confront him

10  with that information.  I told the FBI agent, "If you

11  want me to, I will call him down here.  We can confront

12  him with this, and I will give him instructions to

13  disclose that information to you.  And if he doesn't do

14  it, I will ask the Court to revoke him."

15  Because for someone to claim that he has

16  information on an FBI top ten fugitive, who is living

17  out of the country, and not disclose that

18  unconditionally clearly is going to be a problem for

19  someone on supervised release.

20  Q    It creates problems with your ability to supervise

21  him --

22  A    Exactly.  Well, at that point we had asked him

23  about eight days prior if he had contact with anybody

24  he knew to be a felon, and he adamantly maintained that

25  he had not.

1    So as soon as he told me this information I

2    realized that he had committed violations of his

3    supervision.

4         Mr. Jackson -- He indicated that he requested that

5    I not pursue that at that point, and I told him I would

6    agree to that.  I did let him know that I already knew

7    that Mr. Phillips would be coming to the office the

8    next morning to give a random drug screen.

9         I told the FBI agent about mine and my

10   supervisor's conversation with him at his place of

11   employment and that he had adamantly denied to us that

12   he knew that he had any contact with a felon.

13        And I let the FBI agent know that when he came in

14   the next morning, I was going to revisit that issue

15   with him.

16   Q    Did you, in fact, do that?

17   A    I did.

18   Q    Okay.  So Mr. Phillips came in for a random drug

19   screen the next day?

20   A    He did.

21   Q    Did you have an opportunity to address this with

22   him?

23   A    I did.

24   Q    What happened?

25   A    I had him come into the office.  I told him I

1    wanted to revisit this issue with his friend in

2    Thailand and I had concerns about that.  And I asked

3    him -- At this point I asked him who the friend was,

4    what his name was.

5    He was taken aback by that request.  I remember he

6    looked at me and said, "You want to know his name?"  I

7    said, "Yes, I want to know his name."  He said his name

8    was Leo Phillips.

9    I asked him again if he knew whether or not Leo

10    Phillips was a felon or a sex offender or anybody who

11    engaged in criminal activity with children under 18.

12    He said, "No."

13    I do need to add one thing.  When we spoke to him

14    on the 11th, we instructed Mr. Phillips to ask this

15    friend of his if he was a convicted felon.

16    When he came in on the 20th, I asked Mr. Phillips

17    if he had received notice from his friend as to whether

18    or not he was a convicted felon.  He told me, no, that

19    he had not e-mailed him since then.

20    I then gave him instruction to e-mail his friend

21    and ask him whether or not he was a convicted felon.

22    Now, when he came in on the 20th, what he didn't

23    know was that I had spoken to the FBI the day before.

24    I took out his conditions of supervision.  I read to

25    him condition number 3, that it is a requirement of his

1    conditions that he speak truthfully with me.

2        I advised him of U.S.C. 18, 1001, that it is a

3    violation of federal law to lie to a federal law

4    enforcement officer during the commission of their

5    duties.

6    Q    Did he appear to understand all that?

7    A    He said he understood.  I asked him again, "Since

8    your release have you had any contact with anybody that

9    you know to be a felon?"  He adamantly denied that he

10   had.

11       I had previously told one of my colleagues, who is

12   in the office next to me, that I really did think that

13   when I pressed him on that issue he would probably tell

14   me that he had had contact with this fugitive.  This

15   colleague is U.S. Probation Officer Joey Byars.

16       I had also told Mr. Byars that, "If he adamantly

17   denies this, I'm going to ask you to come and sit in

18   there."

19       So I went and got Mr. Byars.  I advised him of why

20   we were there, that I was -- that Mr. Phillips was

21   denying having any contact with anybody he knew to be a

22   felon, a sex offender, anybody that engages in sexual

23   activity with children under 18.

24       I asked him again in the presence of Mr. Byars,

25   "Have you had any contact with anybody that you know to

1    be a felon, a sex offender, anybody who engages in

2    criminal activity with anybody under 18 since your

3    release?"  He said, "No".

4    Q    Okay.  And he in no way mentioned Mr. Schillaci at

5    all?

6    A    He did not.  We also asked him about contact with

7    his victim in any manner, in any means, third party,

8    direct, indirect.  He denied it.  He indicated he

9    thought about it, but he denied it.  So I let him go.

10   I let him go on his way.

11        He was there in the office for a long period that

12   day also.  He came in for the screen approximately

13   7:45, and he didn't leave my office until after he was

14   supposed to be at work.  And I know he was there for a

15   long time.

16        And we discussed this issue at length, because I

17   called his supervisor at his place of employment to let

18   him know that he had just left my office and that was

19   why he was going to be late for work.

20   Q    All right.  Well, when is the next time that you

21   had dealings with Mr. Phillips on these issues?

22   A    On -- He came in on December 20th.  The next time

23   I spoke to him about these issues was on January 9th.

24   I mailed him a letter telling him that he needed to

25   come to the office to discuss violations of

1      supervision.

2            Well, we had phone conversations in between then.

3      When he was in the office on the 20th, I had told him

4      that he needed to disclose his polygraph risk list.

5            Every sex offender that we supervise is required

6      to keep a list of any known violations, possible

7      violations, or risky or questionable behavior.  And

8      they are to do that so that when they go to their

9      polygraphs, they can disclose this information.

10           When he came in on the 20th, I told him to submit

11     that list to me.  He said that he would.  He did submit

12     the list.  He also submitted a letter that came -- that

13     was dated on the 23rd of December in which he offered

14     to have no more contact with his friend, Leo Phillips,

15     in Thailand.

16           And he indicated that he was offering this to

17     prove himself trustworthy to me and that he understood

18     that he needed to conduct himself above reproach.

19           On January 9th I sent him a letter telling him to

20     come to the office.  I had reviewed -- I had received

21     his --

22           Wait.  Let me correct something.  On January

23     4th myself and U.S. Probation Officer Doug Corn went to

24     the residence that he lived at, River Hills Apartments

25     in Chattanooga.  And the purpose of that was to verify

1    third-party disclosure.

2    Q    Okay.  When you say you're going there to confirm

3    that he has identified what he's obligated to identify,

4    what he was convicted of, the fact that he's a

5    registered sex offender and the conditions of his

6    conviction --

7    A    That's correct.

8    Q    -- to anyone that he rents from or works with --

9    A    That's correct.

10   Q    -- or whatnot.

11        Okay.  Did you speak to his landlord?

12   A    When we arrived there, the general manager of the

13   complex -- We asked for Constance Smith, which is the

14   individual he said he had spoke to.  She said that she

15   was no longer the assistant manager there but she still

16   lived at the complex.

17        I advised her of why we were there, to confirm

18   that Mr. Phillips had properly disclosed third-party

19   risk, that he was a convicted registered sex offender

20   and that he had advised her of that.

21        The general manager of the complex looked shocked,

22   and she said that Miss Smith had not told her that.

23   She said Miss Smith still lived at the complex, that

24   she would get in touch with Miss Smith and ask her if

25   she could meet with us.

1    A short time later we received a phone call from

2    Miss Smith.  She said that she was still living at the

3    complex, that she vividly remembered Mr. Phillips and

4    that she would be happy to talk to us.

5    So she came down and talked to myself and U.S.

6    Probation Officer Doug Corn.  I asked her if he

7    disclosed that he was a convicted registered sex

8    offender and that he was on supervision for engaging in

9    illicit sexual conduct with minors in foreign places.

10   She looked like a deer caught in the headlights.

11   She said he never told her any of that.  She said that

12   he told her that he was on probation for having sex

13   with an underage prostitute in Thailand.

14   I asked her again, "Did he ever say to you that he

15   was on supervised release, probation, for engaging in

16   illicit conduct with a minor in foreign places?"  She

17   said, "No.  I specifically asked him what he was on

18   probation for, and he said it was for having underage

19   sex with a female prostitute in Thailand."  She made it

20   very clear that he did not disclose that to her.

21   She teared up at one point.  She said that his

22   demeanor and the way he carried himself disarmed her.

23   He had led her to believe that he was relocating from

24   North Carolina and that this offense that he had

25   committed that he was on probation for -- she said that

1   he made her think that it was not a serious offense and

2   that he thought that this individual was over 18.

3       We disclosed to her what he was on supervision for

4   and the fact that it was a boy who was between the ages

5   of 13 and 16.  And she was just dumbfounded.

6       On January 9th I sent a letter to Mr. Phillips

7   telling him to report to the office to discuss

8   probation violations.

9       He called me shortly thereafter after he received

10  the letter, wanted to know if he could come talk about

11  it immediately.  I told him, "No".  I told him I would

12  not discuss this matter with him until the 28th.  I

13  told him that I had information I considered to be

14  valid, which indicated he had clearly violated his

15  conditions.

16      I told him that I had reviewed his polygraph risk

17  list and that in my opinion based on the information I

18  had it was incomplete and that he needed to revise that

19  list.  I told him he needed to submit that by the close

20  of business on January 18th.  He said he would comply.

21  Q    Okay.  Did he, in fact, do that?

22  A    He did.

23  Q    Okay.  What was your purpose of putting off the

24  meeting with him until the 28th?

25  A    Well, at that point it was nothing more than me

1     trying to gather all the facts I had and put them in

2     order and to give him time to update his list.

3          That first list that he submitted to me didn't

4     indicate anything about having any contact with the

5     fugitive.

6     Q     Did that show up in the second list?

7     A     It did.

8     Q     Okay.  Can you please tell us what were some

9     things that showed up in the second disclosure list

10    that were not contained in the first disclosure list.

11    A     He had numerous -- The biggie was the contact with

12    the fugitive.  And I don't have a copy of that list

13    with me, but he disclosed that he had had contact with

14    somebody by the end of September that he learned was --

15    Q     September 2007?

16    A     By the end of September 2007.  He had had

17    contact -- e-mail contact with someone that he knew to

18    be a fugitive and that he was going to contact somebody

19    to see how to get that information to the Government.

20    Q     Okay.  Now, the first --

21         He indicated in his own disclosure list that he

22    had had contact with this person sometime around the

23    end of September 2007?

24    A     Yes, that's --

25    Q     When is the first time that he informed you that

1       he had had contact with this man?

2       A    The first time we discussed contact with that

3       individual was on January 28th when he came to discuss

4       his probation violations.

5       Q    Okay.  Now, had he ever alluded to it before then,

6       sent you a letter talking about meeting with the FBI or

7       anything like that?

8       A    He did.  He had sent me a letter, and it arrived

9       at the probation office on December 26.  I was out of

10      the office for the holidays.  I got it back when I came

11      back on the 2nd of January.

12      And he indicated that he had actually met with the

13      FBI agent on the 21st of December about an ongoing

14      investigation.  He didn't indicate in the letter what

15      it was about.

16      Q    But did you later learn that this was regarding

17      his contact with Mr. Schillaci?

18      A    I knew that already because of my contact with the

19      FBI agent.  But he did not disclose that in the letter

20      that he sent to me.  He just said he met with the FBI

21      agent about an ongoing investigation.

22      Q    Had he ever disclosed this to you before then in

23      any other way?

24      A    No.

25      Q    Okay.  Did it show up on any of his monthly

1    reports?

2    A    Absolutely not.

3    Q    Okay.  Now, let's move forward to the meeting with

4    him on January 28th.

5    A    Okay.

6    Q    And what was the purpose of that meeting exactly?

7    A    The purpose of that meeting was to address the

8    violations that I knew of, which at that point was that

9    he had had contact with this fugitive, that he did not

10   disclose that on his monthly report form for

11   September 2007, that he had blatantly lied to myself

12   and my supervisor on December 11th when we spoke to him

13   at his place of employment, that he had blatantly lied

14   to myself and U.S. Probation Officer Joey Byars on

15   December 20th when we asked him again if he had had

16   contact with a felon, and to discuss with him the

17   information I had received from Miss Smith, who was the

18   apartment manager where he lived.

19   Q    Okay.  And was this the day that he was to be

20   administered the polygraph?

21   A    No.  That was not that day.

22   Q    What happened in this meeting on the 28th when you

23   advised him?

24   A    He came in on the 28th, and he was actually pretty

25   contrite that day.  He informed me that he had been to

1    treatment on the 26th and that he finally understood

2    that truthfulness meant full disclosure, that he had

3    had an in-depth session with his treatment provider as

4    well as the group members.  And he admitted that he had

5    made some mistakes about things he had done on

6    supervision, that he should have disclosed to me some

7    things that he didn't.

8        He also -- We discussed with him at length this

9    issue with the felon and fugitive.  He admitted that he

10   had initiated e-mail contact with this man shortly

11   after his release and that the purpose of it was to

12   thank him for harboring him when he had left Thailand.

13   Q    So he had known this man before, correct?

14   A    That's correct.

15       Now, he did tell us that he didn't know the man's

16   true identity, that he knew him as Dylan Thomas and

17   that he did not know he was wanted by the FBI.

18   Q    Did he say, though, what his circumstances of

19   knowing him before were and how long he had known him?

20   A    He did.  He said that when he had left Thailand in

21   2004 after the Thai police had begun searching for him

22   for what is the basis of the instant offense, he left

23   Thailand and he had gone to another country.  I don't

24   remember what that was.

25       He said he had e-mailed this individual that he

1    knew as Dylan Thomas and asked him if he could meet

2    with him or if he could help him.  And he spoke on that

3    in great detail and talked about how Mr. Thomas was

4    someone that he met through a BoyChat/Boy Lover,

5    message board and that Mr. Thomas told him that he

6    could come there but there would be certain protocols

7    that he would have to meet to do that.

8        And he basically explained it, and it sounded like

9    one of those movies where people are meeting and doing

10   spy games.  He said he had to go to a park in

11   Guadalajara at four o'clock in the morning, wear

12   certain things and that someone would approach him.

13       He said this individual did approach him by the

14   name -- and told him he was Dylan Thomas.  They went

15   back to where this individual was living.  He said that

16   the individual while he was there -- He lived there

17   approximately 30 days.  He made the comment that this

18   individual was at one time the webmaster of the BoyChat

19   message board.

20       He also indicated that he knew that this

21   individual was someone who engaged in sex with young

22   boys because there were little boys in and out of there

23   all the time.  He said --

24   Q    This is what Mr. Phillips told you he witnessed

25   during his stay with this man in Mexico?

1      A      That's right.  We asked him if he actually saw the

2      man having sexual interaction with young boys.  He said

3      he didn't.  We even asked him, "How do you know he's

4      having sex with those boys?"  And his comment was,

5      "Well, if you live with somebody, you know what they're

6      doing."

7             So he said he finally -- After things calmed down

8      he said he decided to return to the United States.  And

9      he indicated that Mr. Thomas asked him to check on his

10     outstanding warrants for him when he got back here.  He

11     said that --

12     Q      He asked him in 2004 to check on the outstanding

13     warrants for him?

14     A      That was his comment to me and my supervisor.

15     Q      All right.  Now, in this meeting on the 28th I

16     believe you testified previously that Mr. Phillips had

17     said that he had only recently realized that

18     truthfulness meant full disclosure?

19     A      That's correct.

20     Q      During your history supervising Mr. Phillips has

21     he ever given you any indication that he did not

22     understand you when you were explaining things to him

23     or that he did not understand the conditions under

24     which he was being supervised?

25     A      Absolutely not.  The condition that I remember he

1    had the most questions about was third-party

2    disclosure.

3        You know, this issue of honesty -- We talked about

4    that virtually every time we talked.  And that was one

5    thing -- not only with Mr. Phillips but every sex

6    offender I have.  I drill into their head the

7    importance of being honest, because if they can't be

8    trusted, then from our standpoint -- Our primary duty

9    as probation officers and Officers of the Court is to

10    protect the community.  And we have to be able to

11    believe that these individuals are complying with their

12    conditions.

13        That was drilled into his head virtually every

14    time we talked; so much so to the point that when I

15    began to discuss some of these issues with his

16    treatment provider in early January, his treatment

17    provider even commented about how in their treatment

18    groups sometimes it's spoken about how the federal

19    P.O., referring to me, beats on the fact that they have

20    to be honest.

21        So he never at any time indicated he didn't

22    understand what truthfulness and honesty meant.

23    Q    Well, now, I believe you testified earlier that

24    you are a mental health specialist with the probation

25    office, is that correct?

1    A    That's correct.

2    Q    Do you have an opinion as to whether or not

3    Mr. Phillips is an intelligent man of average or

4    greater intelligence, or does he ever appear to have

5    trouble understanding things in any way?

6    A    He's extremely intelligent.  And he even spoke on

7    one occasion when we are talking about -- We were

8    talking one time about some short stories that he used

9    to write.  And these short stories involved young

10    children who entered into relationships with adults.

11    And during the course of that conversation he also

12    indicated that he would do other stories, science

13    fiction related --

14    But it was obvious that the man had a lot of

15    intelligence and that he didn't have any trouble

16    understanding anything, not to mention he was working

17    as a paralegal.

18    Q    Now, did anything -- anything else take place in

19    that meeting on January 28th?

20    A    We talked about a lot of issues that day.  He also

21    admitted that he had had contact with two other

22    individuals that he met through the BoyChat/Boy Lover

23    message board.

24    Q    Now, had he ever disclosed that he had had contact

25    with these individuals before January 28th?

1      A      He had disclosed that he had had contact with one

2      of them but he had not disclosed to me that he had met

3      that individual through BoyChat.  And that is Leo

4      Phillips.

5            This is the individual that he was e-mailing from

6      Thailand that we discussed on December 11th and on

7      December 20th.

8            And he admitted that he had met Leo Phillips

9      through the BoyChat/Boy Lover message board as well as

10     another individual by the name of Richard Murphy.  One

11     other --

12     Q      Had Mr. --

13     A      Excuse me.

14     Q      I'm sorry.  Go ahead.

15     A      One other thing I need to mention, too -- It's

16     part of the Petition -- is that we discussed that day

17     his information about the fugitive.  And he also

18     disclosed that day that he had sent -- We asked him

19     what e-mail address he had used to communicate with the

20     fugitive.  And he indicated that the e-mail address was

21     through Hushmail.com.

22           We then told him that he needed to disclose all

23     e-mail addresses that he had used since his release.

24     And he disclosed five e-mail addresses, two of which

25     were through Hushmail.com.

1        And I looked Hushmail.com up on the internet, and

2    it's a Canadian-based company that specializes in

3    encrypted e-mail.  And they boast that since they are a

4    Canadian company they have indicated on their website

5    that foreign law enforcement officials would have to go

6    through their Department of State in order to get

7    subpoenas in order to find information out about any of

8    that e-mail.

9    Q    Had Mr. Phillips disclosed to you these other

10   e-mail addresses that he had before this?

11   A    He had only disclosed one e-mail address to that

12   point and he had put that one on his monthly report

13   form, and it was Gregory A. Phillips -- I believe it

14   was AOL.com.  That's the only e-mail address that he

15   had disclosed.

16   Q    How many additional e-mail addresses did he

17   disclose to you that day?

18   A    A total of four; one was work e-mail, so three

19   others.

20   Q    And it was with these e-mail addresses that he

21   admitted having communication and contact with people

22   that he met on BoyChat/Boy Lovers?

23   A    Yes, that's correct.  He admitted that the e-mail

24   address that he used to contact the felon was Kyosa,

25   K-y-o-s-a, at Hushmail.com.  And that is from that

1    website that -- or Hushmail is the company that

2    specializes in encrypted e-mail.

3    Q    Now, when is the next time that you met with

4    Mr. Phillips?

5    A    We met on the 28th -- After we got through that

6    day in the office -- and that was a long

7    conversation -- we went out to his residence.  And my

8    intention was to go and have him pull up his -- on his

9    computer his Internet files and have him do that.  He

10    does have a search condition.

11        He turned on his computer, went to the internet.

12    The internet security protocols are set so that they

13    would be deleted when he turned the system off.

14        The apartment was small.  He did have a little

15    storage room.  We looked in the storage room.  There

16    was a box of files there.  I asked him to open the box

17    of files and just briefly looked through some of them.

18        One of them had a -- It was a file that had a

19    letter in it and which he mailed to Thailand on

20    September 28th, 2007.  And in this letter -- He had

21    sent it to a man by the name of Alex Pulver, and he was

22    asking him to provide -- or gather some information on

23    his company that he had when he was over there.

24        But in that letter he indicated that his mailing

25    address in the United States was a PO box in Athens,

1        Tennessee.  And he had never disclosed on his monthly

2        report forms any mailing addresses other than his

3        residence of record, which was where he was living.

4        Q    He never disclosed to you that he had been using a

5        post office box in Athens, Tennessee?

6        A    He did not.

7        Q    Okay.  Have you been able to determine that is

8        Mr. Phillips' post office box or does it belong to an

9        associate, or do you know?

10       A    We asked him about that when we found that, and he

11       said that that was a post office box of a friend of his

12       by the name of Paul Schwagger (phonetic).

13            We also addressed these violations about not

14       disclosing the e-mail.  When he disclosed the other

15       e-mail addresses, we asked him why he didn't disclose

16       them.  And he said that he relied on this definition

17       of -- he didn't understand that truthful meant full

18       disclosure.

19       Q    So he again said that he did not realize to be

20       truthful -- that that meant full disclosure?

21       A    That's correct.

22            And on that issue -- You know, when we talked on

23       that first day about him complying with his conditions

24       -- I go over that monthly report form.  You know, I

25       read the conditions to them, that they have to submit a

1     complete and truthful monthly report.

2         And when I explained the monthly report forms to

3     him -- This is everybody on supervision, not just sex

4     offenders.  This is everybody -- I explain to them they

5     need to make sure that's truthful and complete and that

6     if they don't fully disclose the information, they

7     could be charged with lying on the form.

8         I even made a comment to Mr. Phillips that if

9     there wasn't enough room on the form for the

10    information that he needed to put down there, he could

11    use a separate sheet if he needed to.

12        And the example I use on that with everybody is

13    where it has the space for vehicles -- Because there is

14    only two spaces there and it's not uncommon for people

15    to have two or more vehicles and then have work

16    vehicles that they drive.

17        And I said, "So if you have something here where

18    it asks for information and there's not enough room to

19    put all of it, then you can either write it somewhere

20    on the side or use a separate sheet of information."

21    Q    Did he appear to understand that?

22    A    He sure did.

23    Q    Now, on this meeting -- or at this meeting on the

24    28th did you arrange the polygraph?

25    A    I had arranged the polygraph prior to that

1    meeting.  I don't remember when, but I instructed him

2    that he would be going to a polygraph on

3    February 1st and that he needed to be truthful.  I

4    asked him if there was anything he needed to disclose

5    prior to the polygraph, and he said he felt like he had

6    disclosed everything.

7    Q    Okay.  And did he show up for his polygraph?

8    A    He did.

9    Q    Okay.  And during the course of his -- or before

10   he took his polygraph examination was he given a

11   battery of questions?

12   A    He was.

13   Q    Okay.  And did he answer these questions?

14   A    He did.

15   Q    Okay.  And have you had an opportunity to review

16   his answers to these questions?

17   A    Yes, I have.

18   Q    And could you please tell us was there anything

19   that he answered in these polygraph questions that was

20   inconsistent with what Mr. Phillips had been telling

21   you before this?

22   A    On those polygraph questions he indicated -- One

23   of questions is whether he had had any contact with

24   someone who is a convicted felon.  He did admit he had

25   a contact with a fugitive.

1        He had a question that was, "Since your

2    supervision began on August 15th, 2007, have you had

3    any indirect and/or third-party contact of any type or

4    by any means with your victims?"

5        He wrote, "Yes, I have spoken with Richard and Leo

6    -- "  And these are two individuals he met through the

7    BoyChat/Boy Lover website.  "I have spoken with Richard

8    and Leo about Ong but never requested or suggested that

9    anyone try to make contact with him or his family."

10        And then there was another one --

11   Q    Did he disclose in this question that Leo Phillips

12   might possibly be a convicted felon?

13   A    Yes, he did.  He was --

14   Q    Did he disclose in this questionnaire that Leo

15   Phillips had -- to his knowledge was someone that

16   engaged in sexual activity with children under the age

17   of 18?

18   A    He replied, "Yes".

19   Q    Okay.  Is that contrary to what he had told you

20   before?

21   A    Yes, it is.

22   Q    Okay.  Was there any --

23   A    He also acknowledged that he had had -- that there

24   had been at least three e-mails with the fugitive Jon

25   Schillaci on or before the end of September of 2007.

1    Q    And he disclosed that himself on this

2    pre-polygraph report?

3    A    He did.

4    Q    Did he admit in this -- in his pre-polygraph

5    report that he had knowingly lied to you?

6    A    He did.

7    Q    And did he admit in this pre-polygraph report that

8    since supervision began on August 17th, 2007, that he

9    had knowingly misrepresented any information to you or

10   knowingly misled you?

11   A    He replied, "Yes".

12        On February 11th I had him report to the office to

13   discuss the polygraph results, because after the exam

14   he admitted that there was a fourth person that he had

15   had e-mail contact with by the name of Lance Roberts.

16        And I discussed that with him and asked him who

17   Lance Roberts was, and he said it was somebody who he

18   asked to check on a short story that he had submitted

19   prior to when he was incarcerated.

20        And he was irritated with Mr. Roberts because

21   Mr. Roberts did not respond to him the way he wanted

22   him to.

23             MR. ATCHLEY:  Your Honor, at this time may I

24   approach the witness?

25             THE COURT:  You may.

BY MR. ATCHLEY:

Q    Probation Officer, I'm going to hand you a
document.  Could you identify this for the Court,
please.

A    This is the polygraph report on Mr. Phillips and
the polygraph questions that were asked during the
pre-test questioning on February --

Q    Okay.  Look through all those questions carefully
and please tell the Court whether or not that's a true
and accurate copy of his responses to those questions.

A    (Looking.)  Yes, it is.

        MR. ATCHLEY:  Okay.  Your Honor, at this time
I would move this into evidence as the Government's
Exhibit No. 2, please.

        THE COURT:  It will be received.

        (Government Exhibit No. 2 was admitted.)

BY MR. ATCHLEY:

Q    Okay.  I believe you were discussing your meeting
with him on the 11th.

A    Right.  On the 11th he came in to discuss the
polygraph results, and he admitted one other individual
by the name of Lance Roberts.

        He was still contrite that day and admitted he had
made a lot of mistakes, that he had misled me, that he
should have been more honest about what was going on.

1    Q    Was it at this time you decided to request the

2    Court to violate Mr. Phillips?

3    A    Yes, it was.

4         One thing, too -- We talked a lot on the

5    28th about his treatment because I had had a couple of

6    conversations with his treatment provider.  I let

7    the -- Mr. Phillips has a requirement that he

8    participate in mental health treatment, sex offender

9    treatment, and one of the requirements is that he be

10   truthful in treatment.  And this goes, too, to some of

11   the violations.

12        He has a supplemental sex offender monthly report

13   form that he has to submit every month, and a couple of

14   the questions on there are whether or not he has

15   committed any -- if there has been any risky behavior

16   that he needs to talk about in treatment or disclose to

17   the probation officer.

18        And he had not indicated on any of those reports

19   that he had had contact with this fugitive or that he

20   had misled Miss Smith at the apartment complex.  I

21   called his treatment provider on January 9th and let

22   him know about some of these issues.

23        And I had a few conversations with him.  The first

24   one was on the 9th.  And the treatment provider was

25   very surprised at this.  He indicated that a lot of

1          this behavior clearly was going to be a problem.

2          On January 30th I called him back after

3     Mr. Phillips came in and admitted that he had met -- or

4     he had initiated e-mail contact with at least three

5     people that he knew through the BoyChat/Boy Lover

6     message board.

7          And the treatment provider was very surprised at

8     this.  And he made a comment to me that that is

9     extremely high risk behavior on his part.  And I said,

10    "When you say high risk behavior, what do you mean?"  I

11    said, "I interpret that as a high risk to reoffend."

12    And he said, "Yes".

13         And he indicated that for Mr. Phillips to come out

14    of prison for the offense he was convicted of and then

15    immediately get back into associations with these

16    people was clearly a violation of his treatment, that

17    it is something he should have disclosed in treatment

18    and that he did not.

19         And I advised his treatment provider that he

20    claimed that these individuals were people who could

21    provide him with support and his treatment provider

22    flatly rejected that as a lie.  And he stated that,

23    "Look, the only reason why these guys associate is

24    because they like to have sex with underage boys, and

25    it's illegal behavior."  And he flatly rejected that.

1       He said that this was a clear indication that he

2   had a thinking problem, and he just didn't get the fact

3   that he was on supervision.

4           MR. ATCHLEY:  Your Honor, if I may approach

5   the witness?

6           THE COURT:  You may.

7   BY MR. ATCHLEY:

8   Q   One last thing here, Probation Officer, and then

9   we'll wrap it up.

10       I'm going to show you a document.  Can you

11   identify that for the Court, please.

12   A   (Looking.)  This is a copy of a letter that I

13   received from Mr. Phillips' therapist, Dr. Bertin

14   Glennon, that he had sent to Mr. Phillips' attorney

15   regarding his treatment.

16   Q   Okay.  Sent to Mr. Phillips' attorney at her

17   request, or do you know?

18   A   It's my understanding it was at her request.

19           MR. ATCHLEY:  If I could, Your Honor, I would

20   like to --

21           THE WITNESS:  It's addressed to her.

22           MR. ATCHLEY:  -- have it received into

23   evidence, please.

24           THE COURT:  It will be received.

25           (Government Exhibit No. 3 was admitted.)

1    BY MR. ATCHLEY:

2    Q    Lastly -- One last thing, Probation Officer.   Is

3         there anything that you know based upon your

4         supervision of Mr. Phillips and events that have taken

5         place since he's been under your supervision that you

6         think the Court would like to know or that you need to

7         bring to the Court's attention regarding his compliance

8         with supervised release and his dangerousness to the

9         community?

10   A    Yes, there is one other thing.

11        On March 5th I contacted Constance Smith, who was

12        the apartment manager when he signed his lease.   I

13        asked her if we, myself and my supervisor, could come

14        out and see her and ask her to review my Petition that

15        I had submitted to the Court.   And I wanted her to

16        review the part that dealt with her and get her to tell

17        me if there were any mistakes in it or any fallacies.

18        We went out there, and she said -- She read the

19        Petition.   She indicated she didn't have a problem with

20        it.   She even signed it indicating she believed the

21        statements were very accurate.

22        She also told us that she had had a conversation

23        with a man at the apartment complex named Randy Heaton

24        (phonetic) back shortly after we met with her on

25        January 4th.

1          MS. McFADDEN:  Your Honor, I'm going to

2     object to this.  I know that the rules of hearsay and

3     the rules of evidence don't apply in this.  This is

4     something that Mr. Atchley provided to me today, a

5     documentation on this interview.

6          We're getting into quadruple hearsay.  Again

7     I know the rules don't apply, but this is information

8     that is new to me as of today.  And I'm not trying to

9     blindside Mr. Atchley.  I did get it today.

10         But so I would object on the grounds that,

11    one, I'm not prepared to either refute it or

12    investigate it; two, we're getting into triple,

13    quadruple hearsay.

14         Again I know the rules don't apply, but in

15    the interest of fairness, the ability to be able to

16    either investigate the person making it or look into

17    the allegations, it's unfair to Mr. Phillips to have

18    that admitted today.

19         THE COURT:  Mr. Atchley.

20         MR. ATCHLEY:  Yes, sir.

21         On the second issue, the evidentiary issue,

22    actually the agent is prepared to testify not about

23    what he was told somebody told this person.  He

24    actually went out and interviewed this person, so he's

25    prepared to tell exactly what was told to him, which is

1    clearly admissible in these types of hearings.

2         Firstly, with regard to the notice, she's

3    absolutely correct.  I provided this to her today when

4    it came to my attention.  It is not part of the

5    Petition.  It came up after the Petition was drafted.

6    I do, however, think that he has been notified of this

7    in writing.  He's aware of this.

8         I would have no objection if she wanted to

9    have a moment to review through it and look at it with

10   the Court's permission.

11        It is not one of the enumerated bases for his

12   violation.  However, I think it is certainly something

13   that is relevant to the Court to consider in this

14   hearing.

15        And if the Court chooses not to hear it in

16   the guilt phase today, I think it clearly would be

17   admissible for the Court to hear later on in a

18   punishment phase, should the Court find that

19   Mr. Phillips has, in fact, violated his supervised

20   release.

21             THE COURT:  Miss McFadden.

22             MS. McFADDEN:  Your Honor, quite frankly, we

23   don't think it's relevant since it's not one of the

24   violations.

25             Second of all, maybe -- I have no reason to

1    know one way or the other whether this person has a

2    criminal record, whether this person has a motive to

3    lie.  I have no idea.

4              And with it being given to me today -- It was

5    done approximately three weeks ago.  Mr. Chavers could

6    have provided it the U.S. attorney and to myself much

7    earlier than this so I would have had the opportunity

8    to prepare and discuss it.  I might not -- I might have

9    subpoenaed that person to be here so I could

10   cross-examine him about the statements.

11             I do not blame Mr. Atchley, but I was

12   blindsided by this today.  Your Honor, I don't think

13   it's fair for Mr. Phillips to have it admitted under

14   any circumstances.  It's not relevant to the Petition

15   and without an opportunity to fully locate and

16   cross-examine this person -- I don't think it's

17   relevant to anything.  I don't think the Court should

18   be considering that just in the matter of justice and

19   fairness.

20             THE COURT:  Okay.  Counsel, let's take a

21   brief recess.

22             And, Mr. Atchley, and, Miss McFadden, why

23   don't you discuss this.  And, quite frankly, if you

24   want to amend your Petition to include this as a

25   charge, I think that it is only fair to give

1     Miss McFadden some time to review it and to be prepared

2     to rebut it -- or we can go forward today.  However, if

3     we do forward today, I think that it should not be

4     considered as part of the hearing to determine if the

5     defendant has violated the conditions of his supervised

6     release and should only be considered in the guilt

7     phase -- the sentencing phase of the hearing.

8          At the same time, Miss McFadden, if you want

9     some additional time to prepare to rebut this charge,

10    I'll be glad to give it to you.

11         I understand that Mr. Atchley was just

12    provided this information this morning.  Quite

13    obviously, he couldn't get it to you before he got it.

14    And this is a very serious matter, and I don't think we

15    should be in any hurry.

16         Let's take a ten-minute recess and then we'll

17    reconvene.

18         MS. McFADDEN:  Thank you, Your Honor.

19         THE COURTROOM DEPUTY:  All rise.

20         THE COURT:  You may come down.

21         THE COURTROOM DEPUTY:  The Court stands in

22    recess.

23         (A recess was taken.)

24         THE COURTROOM DEPUTY:  All rise.  This Court

25    is in session with the Honorable Thomas W. Phillips

1    presiding.

2              Please come to order and be seated.

3              THE COURT:  We're missing Miss McFadden.

4              MR. ATCHLEY:  I apologize.  I thought she was

5    in the courtroom, and I apologize.

6              THE COURT:  That's okay.

7              (Ms. McFadden entered the courtroom.)

8              MS. McFADDEN:  I'm sorry, Your Honor.

9              THE COURT:  That's quite all right.  We

10   thought everybody was here.

11             Okay.  Where are we, Miss McFadden?  Do you

12   need some additional time to rebut this testimony?

13             MS. McFADDEN:  No, Your Honor.

14             Based on the information from the Court that

15   the Court would not consider it for the purpose of

16   whether or not -- for guilt or innocence of whether or

17   not there was a violation and that the Court would

18   consider it for purposes of sentencing -- or might

19   consider it for purposes of sentencing, if we got that

20   far, we do not need additional time.

21             THE COURT:  Very well.

22             Ready to proceed, Mr. Atchley?

23             MR. ATCHLEY:  Yes, sir.

24   BY MR. ATCHLEY:

25   Q    And as we were going, Probation Officer, did you

1     have an opportunity after you received this information

2     to interview Mr. Heaton, the resident of the apartment?

3     A     Yes, I did.

4     Q     Okay.  And did he tell you exactly what had

5     happened?

6     A     He indicated to myself and my supervisor that some

7     time back around Thanksgiving -- sometime in

8     November -- He said around Thanksgiving that he had an

9     experience that was extremely weird and awkward.

10         And he indicated that he had returned from the

11    grocery store with his young daughter and that she was

12    holding the door open for him as he was bringing the

13    groceries in.  And he indicated that as he was coming

14    in with the groceries he noticed a man standing at the

15    top of stairs who was looking at his child.

16         And he said he noticed that as he walked into

17    the -- through the door he noticed that the man did not

18    look at him or acknowledge him but kept looking at his

19    child.

20         He said that it bothered him so much that the man

21    was not acknowledging -- or looking at the child but

22    not acknowledging him that he took notice of it.  As he

23    got closer to the individual -- the Individual is

24    standing at the top of the stairs -- he said as he

25    began to walk up the stairs he expected that the

1    individual would look at him but he did not.  He kept

2    looking at his child.

3        And he said that it was something that he clearly

4    noticed.  He clearly thought there was something wrong

5    with the demeanor of the individual standing at the top

6    of the stairs and that the fact that he was so fixated

7    on his daughter bothered him intently, to the point

8    that he confronted the man.

9        He said he looked at the individual and asked if

10   he had a problem.  He said the man immediately looked

11   down and walked down the stairs and walked out.

12       I asked Mr. Heaton why he confronted the

13   individual.  And he indicated that the man was so

14   obvious and blatant in his fixation on his child -- and

15   he said that he wanted the man to know that he noticed

16   it and that he wanted the man to know that his child

17   was off limits.  Now --

18   Q    I'm sorry.

19   A    Go ahead.

20   Q    Did you ask Mr. Heaton if he could identify this

21   individual?

22   A    Yes, I did.  Actually before we got into the

23   details of it he had indicated that there was an

24   incident with an individual that took him by surprise.

25   We had carried a picture of Mr. Phillips, which is the

1       picture that I took of him on the day that he came to

2       the office for his initial office contact.

3       Q    So it was a recent photograph?

4       A    It was from 8/16/2007.  I showed that to

5       Mr. Heaton, and without hesitation he said that was the

6       man.

7       Q    Now, this Mr. Heaton is telling you about an

8       incident that took place at his apartment involving his

9       daughter.

10          Now, your testimony has been here -- today has

11      been that Mr. Phillips' preference is for boys.

12      A    We asked him about that.  We asked him how old his

13      daughter was.  He said she was seven years old.  And we

14      asked him if he could remember what she was wearing

15      that day, and he said that she was wearing a ball cap

16      with a T-shirt and either jeans or sweats.

17          And we told him that Mr. Phillips' preference was

18      boys.  And he indicated that his girl was a tomboy and

19      that she had her hair up under that cap that day.

20          We asked him if he thought that since his girl was

21      so young there is a possibility she could be confused

22      for a boy, and he said that he thought she could given

23      that she had the ball cap on and her hair was tucked

24      under and she was dressed in a T-shirt and either jeans

25      or sweats.

1    In fact, when I told him that Mr. Phillips was

2  a -- that he preferred boys and asked him what his

3  daughter was wearing, he even made the comment to me

4  that it made sense, the way she was dressed -- if he's

5  attracted to boys, it made sense to him then why he was

6  looking at her.

7    He thought he was looking at her because she was a

8  little girl.  And when I told him that he was attracted

9  to boys and asked how she dressed and how she had her

10  hair that day, he said, "Oh, I guess that makes sense

11  then why he was looking at her."

12  Q  Probation officer, can you think of anything else

13  with regard to the Petition violation -- the Petition

14  requesting a violation of Mr. Phillips' supervised

15  release that you would like to bring to the attention

16  of the Court today?

17  A  I believe we have basically covered it.  What it

18  all boils down to simply is that when he came in on

19  August 16th, I made it extremely clear to him that he

20  was a high profile case and that he was someone that

21  needed to comply fully with the conditions.  He told me

22  he understood that.  I made it very clear to him that

23  he was to be accountable for himself if any concerns or

24  questions arise.

25    He told me he understood.  He made it clear to me

1    that he understood the social ramifications of his

2    conviction and the fact that he was high profile and

3    that convicted sex offenders are highly watched in the

4    country.

5         I made it very clear to Mr. Phillips that if he

6    had any questions about whether or not something was a

7    violation or could be a violation, he was to contact

8    me.  He indicated he understood.

9         I made it extremely clear to Mr. Phillips on

10   numerous occasions that he was to be honest and

11   truthful with me and his treatment providers and with

12   anybody that I identified as a third-party risk.  He

13   said he understood.

14        For the first few months of his supervision I

15   thought he was doing pretty well.  When we had that

16   contact with him on December 11th, I was suspicious,

17   but I still didn't know for sure.

18        When I received that phone call from the FBI agent

19   on December 19th, I knew then that he had been

20   blatantly lying to me since shortly after he got out.

21        When I went out and spoke to the apartment

22   manager, I knew that he had blatantly defied my

23   instructions regarding third-party disclosure.  He had

24   not disclosed that on his sex offender monthly report

25   forms.  He had not talked about that in treatment.

1          When he came to the office on the 28th of January

2     and disclosed that he had had contact with -- that he

3     had initiated contact, e-mail contact, since his

4     release with at least three individuals he met through

5     the BoyChat/Boy Lover message board, I knew then that

6     he had blatantly defied my instructions.

7          When he disclosed that he was using encrypted

8     e-mails and yet he didn't disclose those on his monthly

9     report form -- When we went to his apartment that day

10    and I found a letter that he had sent to Thailand with

11    different mailing addresses that he had not disclosed,

12    it was clear to me that he was -- he had returned to

13    his same pattern of behavior that got him in trouble

14    the first time and that he had done nothing but

15    blatantly deceive, manipulate and lie to me.

16              MR. ATCHLEY:  I have nothing further at this

17    time.

18              THE COURT:  Thank you, Mr. Atchley.

19              Cross-examination, Miss McFadden.

20              MS. McFADDEN:  Thank you, Your Honor.

21                    CROSS-EXAMINATION

22    BY MS. McFADDEN:

23    Q    Good afternoon, Mr. Chavers.

24    A    Good afternoon.

25    Q    First of all, I just wanted to check on a couple

1     of things.

2          You talked about the initial third-party

3     disclosure -- the first place he lived that he hadn't

4     disclosed.  I just want to make clear -- He lived there

5     before you had given him information to disclose, is

6     that correct?

7     A     Yes.

8     Q     So that was not a violation?

9     A     No, it was not.

10    Q     In fact, the third-party disclosure was an oral

11    instruction.  It's not anything in writing or anything

12    he signs, correct?

13    A     Well, he has condition number 13 that he is to

14    make third-party notification disclosure as directed by

15    the probation officer, so it's a Court Order.

16    Q     I understand but you had not -- at that point you

17    had not ordered him to make the disclosure on the

18    15th of August or whenever he moved into the In-Town

19    Suites --

20    A     Right.  That first place that he lived he did not

21    disclose that to her.  I made it clear to him that I

22    was not going to count that as a violation because he

23    had actually checked into that facility before he met

24    with me the first time.

25    Q     And you didn't?  That's not one of the violations?

1    A    That's correct.

2    Q    Fair enough.

3         And his employment -- You confirmed with his

4    employer that he had, in fact, disclosed everything,

5    correct?

6    A    That's exactly right.  In fact --

7    Q    And he had disclosed, correct?

8    A    That's correct.

9    Q    And no question they knew exactly what his

10   probation was for?

11   A    Yes.

12   Q    And they had your card, correct?

13   A    Yeah.

14   Q    And you spoke with his employer, correct?

15   A    I did speak with his employer.  In fact, I had

16   him -- had his employer submit a letter to me.

17   Q    Okay.  So he knew he could get a job --

18   A    I was very satisfied with how he disclosed

19   third-party risk to his employer.

20   Q    So he got a job.  He had basically no problem

21   getting a job even with his conviction?

22   A    That's right.  He did.

23   Q    And you talked about drug screens.  He passed all

24   his drug screens, correct?  No violations there.

25        He did everything he was supposed to do with Sex

1   Offender Registry with the TBI.  He did that regularly

2   and did it properly?

3   A    He did it very well.

4   Q    And pursued his job.  We covered all that.  He did

5   all that.

6       And to your knowledge he's had no contact with

7   minors or gone to inappropriate places, correct?

8   A    That's right.  I have no evidence that he has

9   acted out against a child.

10  Q    Okay.  You have no evidence that he's been to

11  any inappropriate websites?  You have no evidence that

12  he went to BoyChat or Boy Lovers, any of these things,

13  correct?

14  A    Correct.

15  Q    The references you made to his friends, Tag

16  Murphy, Lance Roberts and Leo -- I'm going to get to

17  Mr. Schillaci in a few minutes.  But the three people,

18  Leo Phillips, Tag Murphy -- Richard Murphy and Lance

19  Roberts, are all people he knew prior to 2004, correct?

20  A    That's correct.

21  Q    So there is not an indication -- You're not

22  telling the Court that he has been to inappropriate

23  websites or gotten into contact with new people --

24  A    No, I'm not.

25  Q    -- or made new contacts with people who are

1      inappropriate, right?

2      A      No.

3      Q      And when you found out about Leo Phillips, you

4      instructed Mr. Phillips -- I'm sorry -- Greg Phillips,

5      to get in touch with Leo to confirm whether or not he

6      was a felon, correct?

7      A      Yes, ma'am.  That was on the 20th.  That was

8      before I knew how he met him.

9      Q      Okay.  And he did that, didn't he?

10     A      Yes, he did.

11     Q      And, in fact, he provided you with a copy of the

12     e-mail back from Mr. Phillips?

13     A      Uh-huh.

14     Q      And Mr. Phillips at least indicated to Mr. Greg

15     Phillips that he was not a felon, correct?

16     A      That's correct.

17             MS. McFADDEN:  Your Honor, may I approach the

18     witness?

19             THE COURT:  You may.

20     BY MS. McFADDEN:

21     Q      Mr. Chavers, do you recognize that document?

22     A      Uh-huh, I do.

23     Q      And is that a copy of the e-mail that you received

24     from Mr. Phillips?

25     A      It is.

1    Q    And that indicates that he followed your

2    instructions and Leo was not, in fact, a felon,

3    correct?

4    A    That's right.

5              MS. McFADDEN:  Okay.  I ask that be moved

6    into evidence as Exhibit 1, Defendant's Exhibit 1.

7              THE COURT:  It will be received.

8              (Defendant's Exhibit No. 1 was admitted.)

9              MS. McFADDEN:  Thank you, Your Honor.

10   BY MS. McFADDEN:

11   Q    And you have no evidence, other than Mr. Greg

12   Phillips' indications, that Leo had any other illegal

13   activity or criminal activity going on, correct?  You

14   have no reason to believe on your own that Leo had any

15   criminal activity, any criminal history, any criminal

16   background?

17   A    That's correct.  That's correct.

18   Q    And Tag Murphy -- The only thing that was

19   inappropriate for Mr. Phillips to be in touch with him

20   is because he had met him four years or three years

21   previously in a chat room?

22   A    That's correct.

23   Q    So you didn't have any indication --

24   A    I do not.

25   Q    Okay.  So if it's not -- Can you point to me where

1    in any of the reports any instructions that

2    Mr. Phillips cannot have contact with people that he

3    knows from a prior life even if they're not felons or

4    not involved in criminal activity?  Is there any reason

5    he can't be involved with old friends?

6    A    Well, the issue around these three friends -- four

7    friends is that he's to comply with sex offender

8    treatment, and part of the requirement for his

9    treatment with the Center for Individual Family

10   Effectiveness is that he not engage in risky behavior.

11       This is one of the issues I talked about with his

12   treatment provider.  You know, when I advised his

13   treatment provider -- Before I charged the violation of

14   the -- the treatment violation I called Dr. Glennon to

15   see if he agreed with whether or not this was a

16   violation of treatment.  And he did not hesitate to

17   indicate that this was a violation of his treatment

18   program rules --

19   Q    Okay.

20   A    -- because these were individuals that he

21   associated with while he was in the process of

22   offending.

23   Q    Okay.  But for these purposes he's not to your

24   knowledge associated -- again leaving out

25   Mr. Schillaci -- associated with anybody that has

1   criminal activity or engaged in criminal activity or is

2   a felon, correct?

3   A    Other than -- That's correct.

4   Q    Okay.  Now, you've alleged a number of violations

5   in here.  So if you don't mind, I'm going to go through

6   these.  You have a copy of your report in front of you

7   I assume.

8   A    I do.

9   Q    Now, your first -- the first noncompliance -- the

10  first violation number is that Mr. Phillips shall have

11  no direct or third-party contact with the victim or

12  other children under the age of 18 without prior

13  written consent, is that correct?

14  A    That's correct.

15  Q    The only indication that he's had any contact in

16  any conceivable shape or form is the information you

17  got from Mr. Phillips himself saying he's thought about

18  Ong and he talked to Richard, Tag or Leo, wondering how

19  he was doing, correct?

20  A    Well, he answered "yes" to that question and then

21  explained, right.  That's all.

22  Q    He didn't ask -- To your knowledge he never asked

23  Mr. Murphy or any friends or anyone to get in touch

24  with Ong, correct?

25  A    That's correct.  I asked him about that after the

1     polygraph, and he denied initiating the contact.

2     Q    So to your knowledge he's never had any contact

3     with Ong, direct or indirect?

4     A    That's correct.

5     Q    So really that's not a violation then, correct?

6     A    Well, in my opinion it is.

7     Q    Asking somebody how somebody else is doing is a

8     violation?

9     A    Well, we talked about third-party contact at

10    length.

11    Q    And how is that third-party contact?

12    A    I don't know how he's going to determine how Ong

13    or his family is doing if somebody doesn't approach Ong

14    or his family.  So that's my opinion of that.

15    Q    Okay.  But pure speculation as to how he's doing

16    would not be considered third-party contact, would it?

17    A    Speculation as to how?

18    Q    How Ong is doing.  If I said to you, "Tim, I

19    wonder how my friend Barbie is doing.  I haven't talked

20    to her for a few years."  That's not third-party

21    contact, is it?

22    A    No.

23    Q    Violation number two.  Standard condition number

24    nine, "You shall not associate with persons engaged in

25    criminal activity and shall not associate with anyone

1       convicted of a felony."  We talked about that.

2              With the exception of Mr. Schillaci you have no

3       reason to believe he's had any other contacts --

4       A    That's correct.

5       Q    Okay.  And then -- I will come back -- A lot of

6       this is obviously going to go around Mr. Schillaci, so

7       I will come back to the report and everything like

8       that.

9              Okay.  You talked about one of the violations.  Is

10      that the multiple e-mail addresses?  Correct?

11      A    That's correct.

12      Q    Do you have a copy of your monthly supervision

13      report by chance, a blank one?

14      A    A blank one?  No, I do not.  I'm pretty familiar

15      with that monthly report, though.

16      Q    I know but I would like you to be able to look at

17      it so I can ask you questions.

18              MS. McFADDEN:  May I approach, Your Honor?

19              THE COURT:  You may.

20      BY MS. McFADDEN:

21      Q    You probably know it better than I do,

22      Mr. Chavers.

23      A    I don't know about that.  (Looking.)

24      Q    Mr. Chavers, could you please look at the monthly

25      report.  And is that a true and correct copy of the

1 monthly report that you have your probationers fill

2 out?

3 A There is a few of them in existence, but we do use

4 this one.

5 Q And it's a three-page document, is that correct?

6 A It's front and back and then -- When we give them

7 to the individuals, it's front and back.  So it's one

8 page on front and back.  And then this is one that I

9 give to sex offenders.

10 Q And is that a copy of what you would have given

11 Mr. Phillips to fill out?

12 A Yes.

13 Q And under Part A on the first page it says,

14 "Residence."  And it has the street address, secondary

15 address, mailing address and e-mail address, correct?

16 A That's correct.

17 Q Is that e-mail address or e-mail addresses?

18 A It says e-mail address.

19 Q It's one, correct?

20 A It says e-mail address.  However, when I go over

21 the monthly report forms with individuals, I make it

22 clear to them that they need to put all the information

23 in there.  If they don't have enough room, then they

24 can add it on somewhere on the form or use a separate

25 page.

1    Q    Well -- And I understand that because you talked

2    about vehicles -- how you could list some people with

3    multiple vehicles, but it specifically says, "List all

4    vehicles owned or driven by you."  It doesn't say,

5    "List all e-mail addresses that you use", does it?  It

6    just says e-mail address.

7    A    It says e-mail address.

8    Q    Okay.  Thank you.

9         And the mailing address you talked about -- you

10   found a document that had a different post office box.

11   That wasn't Mr. Phillips' mailing address, was it?  It

12   was Paul Schwagger's, correct?

13   A    He told me it was Paul Schwagger's.

14   Q    Did you check on it?

15   A    No, I didn't.

16   Q    So you have no reason to --

17   A    -- to believe it's not Paul Schwagger's?

18   Q    Right.

19   A    I'm sure it's Paul Schwagger's.

20   Q    And Paul Schwagger is not a person who is either a

21   felon or engaged in criminal activity, is he?

22   A    I know very little about Paul Schwagger.

23   Q    Did you look into him?

24   A    No, I did not.

25   Q    You have no reason to believe that he is an

1    inappropriate person for Mr. Phillips to be in touch

2    with, do you?

3    A    No.

4    Q    And you talked about how he seems to have been

5    doing fine on supervised release.  In fact, you put it

6    in a letter, correct?

7    A    That's exactly right.

8         MS. McFADDEN:  Your Honor, I'm sorry.  I

9    would like to back up.  I would have to like to have

10   the monthly report moved into evidence as Defendant's

11   Exhibit 2.

12        THE COURT:  It will be received.

13        (Defendant's Exhibit No. 2 was admitted.)

14        MS. McFADDEN:  Thank you, Your Honor.

15        May I approach, Your Honor?

16        THE COURT:  You may.

17   BY MS. McFADDEN:

18   Q    Mr. Chavers, you recognize that document, correct?

19   A    Very much so.

20   Q    In fact, that's a letter that you sent

21   Mr. Phillips, at least supposedly at his request,

22   indicating he was doing fine, right?

23   A    That's right.

24   Q    And that was on December 12th?

25   A    Right.

1    Q    And you sent that letter despite what you

2    testified to the Court of being suspicious and having

3    reservations about his behavior on December 11th,

4    correct?

5    A    When we left out of there on December 11th, I had

6    a lot of questions.  I had no evidence.

7    Q    Okay.  Not withstanding that, on December 12th you

8    sent this letter, correct?

9    A    Yes.

10         MS. McFADDEN:  Your Honor, I would ask that

11    be moved into evidence as Defendant's Exhibit's 3.

12         THE COURT:  It will be received.

13         (Defendant's Exhibit No. 3 was admitted.)

14         MS. McFADDEN:  Thank you, Your Honor.

15    BY MS. McFADDEN:

16    Q    Now, as to Mr. Schillaci -- This is a big reason

17    why we are here, because clearly Mr. Schillaci, as we

18    know, is a felon and was on the FBI's Most Wanted List,

19    is that correct?

20    A    That is correct.

21    Q    Mr. Schillaci is somebody that Mr. Phillips knew

22    prior to his conviction, correct?

23    A    That's what Mr. Phillips told me.

24    Q    And he knew him as Dylan Thomas, correct?

25    A    That's what he told me.

1    Q    Again, you have no reason other than whatever you

2    might suspect to disbelieve Mr. Phillips, correct?

3    A    Yes.  The only thing that made me question that

4    was the fact that he said that Mr. Thomas wanted him to

5    check on his outstanding warrants in the United States.

6    And, yeah, we even asked him, "Well, how are you

7    going to check on his warrants if you don't know what

8    his true identity is?"  We asked him about that.  We

9    told him we didn't believe that he didn't know who the

10    guy was.

11    Q    Okay.  But you have no reason to disbelieve him

12    other than what you suspect, correct?

13    A    That's correct.

14    Q    There is no evidence to indicate otherwise,

15    correct?

16    A    No.

17    Q    And did you check to see -- the information you

18    later got was that Mr. Phillips learned that Mr. Thomas

19    -- the person he knew as Mr. Thomas was, in fact, a man

20    named John Schillaci, correct?

21    A    Correct.

22    Q    And he indicated that he learned that from a

23    television show, America's Most Wanted?

24    A    America's Most Wanted.

25    Q    Did you check to see if that was true, if the show

1    aired when it did?

2    A    No, I did not.

3    Q    You had no reason to disbelieve Mr. Phillips, that

4    that's when he found out this person was a felon?

5    A    Other than when he said the guy wanted him to

6    check on his warrants.

7    Q    But presumably he could have checked to see if

8    Dylan Thomas had warrants, correct?

9    A    He could have.

10   Q    So again there is no reason to disbelieve that

11   Mr. Phillips did not know he was a felon until he saw

12   the show, correct?

13        Did I totally confuse you because of my use of

14   pronouns?

15   A    Well, no.  I mean, I understand what you're

16   saying.

17        When he said to me that he wanted -- that that man

18   wanted him to check on his warrants -- I am a probation

19   officer, you know.  To me that goes beyond logical

20   reasoning.

21   Q    Okay.  Well, people have warrants for

22   misdemeanors, don't they?

23   A    They sure do.

24   Q    People have warrants for traffic offenses, don't

25   they?

1    A    They do.  I will readily admit that there is

2    nothing else other than that.

3    Q    Okay.  So just that one raised a red flag and made

4    you suspicious but you've got nothing -- no proof other

5    than your suspicions based on that?

6    A    That's exactly right.

7    Q    All right.  So there is no reason again except for

8    that one thing for you to disbelieve Mr. Phillips'

9    statement that he didn't find out that Mr. Thomas was,

10   in fact, Jon Schillaci until the end of December 2007,

11   is that correct?

12   A    That's correct.

13   Q    Also the e-mail contacts that Mr. Phillips had

14   with Mr. Thomas were all prior to when he learned that

15   Mr. Thomas was actually Mr. Schillaci, correct?

16   A    That's what he stated.

17   Q    You have no reason to disbelieve that, though, do

18   you?

19   A    No.

20   Q    Okay.  So at the time that Mr. Phillips had

21   contact with Mr. Thomas, who we now know as

22   Mr. Schillaci, he did not know -- as far as you know,

23   he did not know that this person that he was in contact

24   with was a felon, correct?

25   A    That's correct.

1    Q   And to your knowledge after he learned that

2    Mr. Thomas Schillaci was a felon he had no contact with

3    him, is that correct?

4    A   That's what he stated, and I have no evidence

5    otherwise.

6    Q   So if he were in touch with somebody that he had

7    no idea was a felon, no idea that he was involved in

8    criminal activity -- I mean, the only thing he knew was

9    from 2004 the guy asked him to check on some warrants.

10    It wouldn't actually be a violation of his probation to

11    be in touch with him, would it?

12    A   Say that one more time.

13    Q   Okay.  Let me rephrase this.

14    You required him to disclose contact with people

15    who were felons or engaged in criminal activity,

16    correct -- that he knew to be involved in criminal

17    activity or knew to be felons?

18    A   Right.  That's a condition of supervision.

19    Q   Okay.

20    A   Now, for Mr. Phillips it went beyond that on

21    December 11th because when we talked to him about his

22    friend, Leo Phillips, I asked him if he had had any

23    interaction with anybody he knew to be a sex offender

24    or someone who engages in sexual activity with children

25    under 18.

1        So from December 11th it goes beyond just the

2    standard condition.  Then you're involving a condition

3    that he answer my questions truthfully.

4    Q   I understand.  But if he did not know that the

5    person was a sex offender or the person was a felon or

6    involved in criminal activity, then it would not be a

7    violation even if the person was, correct?

8    A   That's correct.

9    Q   Okay.

10    A   We discussed that, too.

11    Q   I understand.  I understand.  I appreciate that.

12    I just wanted to make sure that we were straight on

13    that.

14        So at the time he was actually in touch with

15    Mr. Schillaci he wasn't violating a condition of his

16    probation or supervision, was he?

17    A   If he truly did not know that he was a felon or a

18    sex offender --

19        Well, before December 11th?

20    Q   That's what I'm asking.  At the time that he was

21    in touch with Mr. Schillaci --

22    A   That's correct.

23    Q   -- he would not have been in violation of his

24    supervision?

25    A   From December 11th forward not telling me about

1      Mr. Schillaci is a violation.

2      Q    I understand.  I understand.  And I understand

3      your position on that.

4           And if he had gotten advice from a lawyer that was

5      bad advice maybe, not to tell you, would that mitigate

6      your position at all?

7      A    Absolutely not.

8      Q    Okay.

9      A    I believe that the authority to interpret

10     conditions of supervision are delegated to the

11     probation officer by the Court and no one else.

12          And I have made it very clear to him if he had any

13     questions about whether or not he was committing a

14     violation or what he should do, he should call me.

15     Q    I understand that.

16          Okay.  Now, let's talk about his lack of

17     disclosure to the third party for the Department at --

18     the River Hills Manor I think it is.

19     A    Yes.

20     Q    So you are aware that River Hills Manor has other

21     sex offenders living there, correct?

22     A    Yes, that's my understanding.  He indicated that

23     was one of the reasons why he wanted to live there.

24     Q    Because it was a safe distance from a school and

25     there are other people there, correct?

1     A     Yes.

2     Q     And did you check on that to find out if that was,

3     in fact, a correct assumption, that there were other

4     sex offenders there?

5     A     No, I didn't pull that up.

6     Q     But presumably he knew that when he wanted to live

7     there, that there were other sex offenders there,

8     correct?

9     A     Yes.  In fact, the first place he went to was

10    because they had sex offenders living there, so he

11    figured that that would not be an issue.

12    Q     Okay.  And the first time you talked to --

13    Miss Smith I believe is her name -- was at the

14    apartment on January 4th, 2008, correct?

15    A     Yes.

16    Q     In fact, you talked to Miss Byrd first, and

17    Miss Byrd had no idea about Mr. Phillips' status,

18    correct?

19    A     That's correct.

20    Q     And so she got Miss Smith, who was no longer the

21    apartments' assistant manager, to come down, correct?

22    A     That's right.

23    Q     Okay.  And Miss Smith was actually living at the

24    apartment still at that point in time?

25    A     She was.

1    Q    And were you aware that Miss Smith was no longer

2    the assistant manager because she had drug problems?

3    A    No.

4    Q    So you did not know that at the time?

5    A    I did not know that.

6    Q    Were you aware that Miss Smith had several

7    convictions?

8    A    She told me she had problems with the legal

9    system.

10   Q    Okay.  And did you inquire into that further to

11   see if maybe she would be less than credible or you had

12   reason to doubt her credibility?

13   A    No.  From my standpoint she was the apartment

14   manager, and she was the one who interviewed him, and

15   she said this was what had happened.  You know, my

16   focus is on him, not her.

17   Q    So you confronted her in front of the person who

18   was managing the apartments at the time, right?

19   A    Yes.

20   Q    And clearly she hadn't told this person that she

21   rented to a sex offender, correct?

22   A    Rephrase that now.

23   Q    Clearly Miss Smith had not told Miss Byrd that she

24   had rented to a sex offender?

25   A    Now, Miss Byrd said that Miss Smith had not said

1      anything to her --

2      Q      Okay.

3      A      -- about him being a sex offender.

4      Q      Right.  So Miss Smith had not told Miss Byrd about

5      this?

6      A      That's correct.

7      Q      So you're confronting Miss Smith in front of a

8      woman --

9             Let me back up.  It's all in my head.  I'm sorry.

10            Miss Smith rented to a sex offender but didn't

11     tell Miss Byrd?

12     A      Miss Byrd did not know that he was a sex offender.

13     Q      Okay.  So presumably Miss Smith didn't tell her?

14     A      No.  According to Miss Smith, she didn't know he

15     was a sex offender.  He didn't disclose that to her.

16     He told her that he was on federal probation.

17     Q      You gave her your card, correct?

18     A      I gave her my card, but she made it very clear to

19     myself and my colleague, Doug Corn, that day that he

20     told her he was on federal probation for having sex

21     with an underage prostitute in Thailand.  He let her

22     know he was on federal probation and that I was his

23     probation officer.

24            She said she asked him point blank, "Now, what are

25     you on probation for?"  And his response was, "For

1    having sex with an underage female in Thailand."

2    Q    Okay.  My point is that you did all this

3    questioning in front of her apartment manager, correct?

4    A    Yes.

5    Q    Okay.  And she was still living there, correct?

6    A    Yes.

7    Q    And the apartment manager presumably is the one

8    who leases or unleases apartments, correct?

9    A    That's correct.

10   Q    Okay.  So you did all this in front of her, and

11   this was all news as to Miss Byrd?

12   A    As to how serious this offense was?  Oh, yeah,

13   news to both of them.

14   Q    So Miss Smith claimed, correct?

15   A    So she claimed.

16   Q    And you went back later and got a statement from

17   her and talked to her some more to confirm her story,

18   correct?

19   A    That's right.

20   Q    And you did say I think that she told you she had

21   some problems with the law before?

22   A    Uh-huh.

23   Q    And lying to an officer, federal officer, is a

24   felony offense, isn't it?

25   A    That is right.

1  Q So she really couldn't come back and tell you when

2  you were private or tell you something when you were

3  alone with her when she wasn't with her apartment

4  manager, correct?

5  A I'm not sure I understand that question.

6  Q Never mind.  Strike that.

7   I just want to make sure.  The first time you

8  talked to her was in front of her apartment manager?

9  A Yes.

10  Q The person who leases apartments --

11  A Yes.

12  Q -- and unleases apartments?

13  A That's correct.

14  Q Okay.  Why did it matter -- Why did it matter that

15  you told her it was a boy instead of a girl?  I mean,

16  the offense conviction doesn't state what the gender of

17  this victim was, does it?

18  A I told him that as a requirement for him

19  disclosing third-party risk that he was to tell them

20  what his conviction was off the J & C and then

21  truthfully answer any subsequent question that they

22  asked.

23   Now, she indicated she asked him what he was on

24  supervision for.  He told her for hiring an underage

25  female prostitute in Thailand.  Now, that's not what

1    he's on --

2    Q    Okay.  This is the story she told in front of the

3    manager?

4    A    That's right.

5    Q    Okay.  All right.  And you talked about the most

6    recent incident -- or you talked about Mr. Heaton I

7    believe is his name.  You have no indication that

8    Mr. Phillips made contact with the child?

9    A    No.

10   Q    You have no indication that he spoke to the child

11   at all?

12   A    No.

13   Q    I mean, nothing?  Just he looked at her?

14   A    That's correct.

15   Q    Okay.

16   A    Of course, obviously it goes beyond looking for

17   the father to claim he confronted Mr. Phillips about

18   it.

19   Q    I think that if anybody looked at my children at

20   all, I'd start getting suspicious, so, yeah, without

21   again having the opportunity to talk to him.

22   A    I understand.

23        MS. McFADDEN:  May I have a moment, Your

24   Honor?

25        THE COURT:  You may.

1                    (A discussion was held off the record.)

2                    MS. McFADDEN:  Your Honor, I have nothing

3          further.

4                    THE COURT:  Thank you, Miss McFadden.

5                    Any redirect, Mr. Atchley?

6                    MR. ATCHLEY:  No, sir.

7                    Your Honor, that's all the proof I have.

8                    THE COURT:  Okay.  You may come down,

9          Mr. Chavers.

10                   Miss McFadden, do you wish to put on any

11         evidence?

12                   MS. McFADDEN:  Yes, Your Honor.

13                   The only thing I do wish to provide to the

14         Court -- Copies have already been provided to

15         Mr. Atchley -- is the Affidavit of Bradon Raulston who

16         is representing Mr. Phillips with respect to the

17         Schillaci incident and all the factors surrounding it.

18         Mr. Raulston lays out in his Affidavit basically the

19         timeline of what happened.  And I would like to present

20         that to the Court.

21                   THE COURT:  Okay.  That will be received.

22                   MS. McFADDEN:  Thank you, Your Honor.

23                   I would ask it be marked as Defendant's

24         Exhibit 4 I believe.  Thank you.

25                   (Defendant's Exhibit No. 4 was admitted.)

1          MS. McFADDEN:  I do have one other thing,

2     Your Honor.  I'm sorry.

3          Your Honor, I have a letter that goes more

4     to the sentencing -- If the Court determines that

5     Mr. Phillips has actually violated, I have a letter

6     from Mr. Phillips' cousin that I would like to present

7     to the Court.  Copies have already been provided to

8     Mr. Atchley.

9          If I may approach.

10         THE COURT:  It will be received.

11         MS. McFADDEN:  Thank you, Your Honor.

12         Defendant's Exhibit 5?

13         (Defendant's Exhibit No. 5 was admitted.)

14         MS. McFADDEN:  Your Honor, the defense rests.

15         THE COURT:  Thank you, Miss McFadden.

16         Do you have anything further, Mr. Atchley?

17         MR. ATCHLEY:  No, sir, I do not.

18         THE COURT:  Okay.  Why don't we take a

19     five-minute recess while I read these documents,

20     please.

21         MR. ATCHLEY:  Yes, sir.

22         THE COURTROOM DEPUTY:  All rise.

23         Court stands in recess.

24         (Recess taken.)

25         THE COURTROOM DEPUTY:  All rise.  This Court

1   is again in session with the Honorable Thomas Phillips

2   presiding.

3           Please come to order and be seated.

4           THE COURT:  After considering the evidence

5   presented by the Government and the materials presented

6   by the defendant, it is clear to the Court by a

7   preponderance of the evidence that Mr. Phillips has

8   violated the conditions of his supervised release and

9   his supervised release is hereby revoked.

10          This proceeding will now move on to an

11  appropriate sentence for the defendant in this case.

12          And, first of all, counsel, the sentence of

13  this Court shall be made pursuant to the factors set

14  forth in 18 U.S.C. Section 3553(a), treating the

15  Sentencing Commission Guidelines as advisory only.

16          The Court's conclusion as to the appropriate

17  grade violation after considering the Policy Statement

18  and Guideline provisions in this case is Grade C and

19  the defendant's criminal history category is Roman

20  numeral I.

21          Now, Miss McFadden, would you like to make

22  any comments on behalf of the defendant prior to my

23  setting his sentence in this case?

24          MS. McFADDEN:  Your Honor, we would ask the

25  Court stay within the Guideline range of three to nine

1    months.

2         Clearly, the Court has determined that there

3    are violations.  Those violations are all technical as

4    the Court has found.  They are violations that are

5    inappropriate behavior but they're not violations that

6    warrant an extensive term in custody.

7         There is no indication that he has reoffended

8    or that he's a risk to anybody in the community.  So we

9    ask the Court stay within three to nine months, Your

10   Honor.

11        Your Honor, we would also ask the Court

12   consider even though it is a violation he did provide

13   information to the FBI on one of the top ten offenders

14   and they have used that information to try to find this

15   offender.  And he did give that information even

16   without a promise of any kind of leniency or any kind

17   of reduction in his sentence.

18        THE COURT:  In an attempt to broker a deal,

19   Miss McFadden.

20        MS. McFADDEN:  Originally, yes, Your Honor,

21   but it ended up being given even without it.

22        As the Court saw the Affidavit of

23   Mr. Raulston, that information came out even under the

24   circumstances that he wasn't going to get the kind of

25   deal that he wanted.

1            THE COURT:  Thank you, Miss McFadden.

2            Mr. Phillips, anything you would like to say

3    to me before I set your sentence in the case?

4            THE DEFENDANT:  No, Your Honor.

5            THE COURT:  Thank you, Mr. Phillips.

6            Mr. Atchley, comments on behalf of the

7    Government?

8            MR. ATCHLEY:  Yes, Your Honor.  I'll be very

9    brief.  I know you have a full report from the

10   probation office on this case and have had a full day

11   of listening to the testimony.

12           I would just point out to the Court that

13   while these are technical violations, when you look at

14   them individually, they may not at first glance look to

15   be that serious, but when you look at this entire body

16   of all this activity that has taken place really since

17   Mr. Phillips has been under supervision it's clear that

18   he's engaged in a pattern here of manipulation.

19           He's a very intelligent man.  I have no

20   reason to believe he's anything but a very intelligent

21   man.  And he's a manipulator.  He likes to manipulate

22   the system.  He likes to manipulate his probation

23   officer.

24           And the purpose behind that is he wants

25   ultimately to be able to go to a place where he can

1    engage in sex with boys and wants to live in a place

2    where he can engage in sex with boys.

3          And it is the belief of the United States

4    that he established contact with his friend, who we

5    have now learned is a top ten FBI fugitive, for the

6    purpose of trying to broker a release from his

7    supervised release.  I have no doubt in my mind that he

8    orchestrated that.

9          I also have no doubt in my mind, based upon

10   the evidence that is before this Court, that he knew

11   exactly who he was dealing with and exactly what type

12   of person it was.

13         Remember, this is a man that he admitted

14   himself that he had lived with in 2004 after he had

15   fled Thailand in fear of prosecution by the Thai

16   authorities for 30 days and during that period of time

17   had witnessed him as being an individual that was

18   engaging in sex with children.  He knows exactly what

19   he's doing.  He knows exactly who he's dealing with.

20   He knows exactly what his ultimate goal is.

21         And this is a man that we feel like clearly

22   needs to be punished.  And we think that a lengthy term

23   of imprisonment followed by return to supervised

24   release is appropriate in this case.

25         And I think that the Court needs to very

1    seriously consider modifying the term of supervised

2    release after he is out to include some more specific

3    restrictions, such as no computer access, no Internet

4    access, because I think it's become quite clear that's

5    how he is communicating with these people on these chat

6    rooms and these forums.  That's how he continues to

7    communicate with individuals who he knows engage in

8    sex -- he admits himself engage in sex with children,

9    which is clearly contrary to any sort of rehabilitative

10   treatment that the Government wants to offer

11   Mr. Phillips.

12          Clearly, there is no doubt in my mind that as

13   Mr. Phillips sits here today he's an extremely

14   dangerous man.

15          THE COURT:  Mr. Atchley, what is your

16   recommendation as to an appropriate sentence?

17          MR. ATCHLEY:  Your Honor, we feel like a

18   sentence of at least 30 months would be appropriate in

19   this case.

20          THE COURT:  Thank you, Mr. Atchley.

21          Anything further, Miss McFadden?

22          MS. McFADDEN:  No, Your Honor.

23          THE COURT:  Mr. Phillips, it's clear to the

24   Court that you're not going to abide by the conditions

25   of any supervised release that I would put down.

1          And I think that you are a highly intelligent

2     individual.  Unfortunately, you use that intelligence

3     to try to manipulate the system, to try to manipulate

4     people, and it's all to your ultimate ruin.

5          I think that you knew full well who Mr. Jon

6     Schillaci was before you attempted to broker a deal

7     with the FBI, which is a violation of at least the

8     spirit of the conditions that I set for your supervised

9     release.

10          You totally ignored the requirements of the

11     Court in being truthful with your probation officer.

12          And, quite frankly, I am just amazed that you

13     haven't violated more conditions than you have, simply

14     because you appear to feel as though you can do

15     whatever you please, and it doesn't really make any

16     difference what this Court sets for your conditions of

17     release.

18          Therefore, I'm going to state the sentence --

19          You may sit down.

20          I'm going to state the sentence, but I'll

21     give you an opportunity to state any objection that you

22     have to the sentence before it's actually imposed in

23     this case.

24          The Court finds that the defendant has

25     committed violations of his conditions of supervised

release. Therefore, the Court revokes the defendant's
supervised release.

The Court has considered the nature and
circumstances of the offense, the history and
characteristics of the defendant and policy statements,
as well as the other factors listed in 18 U.S.C.
Section 3553(a), including the recommended sentence in
this case.

However, considering that the defendant is a
two-time convicted child sexual offender, who poses a
danger to the community -- And I underline that,
Mr. Phillips. I think you are a clear and present
danger to the community, particularly the children of
the community -- that the defendant has violated his
supervised release conditions almost immediately after
his release from the Bureau of Prisons' custody and
that he is in need of intensive sex offender treatment
available through the Bureau of Prisons Sex Offender
Treatment Program.

The defendant is hereby committed to the
custody of the Bureau of Prisons to be imprisoned for
30 months.

The Court strongly recommends that the Bureau
of Prisons designate the defendant to their facility in
Butner, North Carolina, and that he be placed in the

1    Sex Offender Treatment Program.

2           Upon release from imprisonment, the defendant

3    shall be on supervised release for a term of 20 years.

4           Within 72 hours of release from the custody

5    of the Bureau of Prisons the defendant shall report in

6    person to the probation office in the district to which

7    the defendant is released.

8           While on supervised release the defendant

9    shall not commit another federal, state or local crime,

10   shall comply with the standard conditions that have

11   been adopted by this Court in Local Rule 8310 and shall

12   not possess a controlled substance or a firearm.

13          The defendant shall not possess a firearm as

14   defined in 18 U.S.C. Section 921.

15          In addition, the defendant shall comply with

16   the following special conditions:

17          The defendant shall not own, use or possess a

18   computer or any other electronic device with Internet

19   capability without the written permission of the

20   probation officer.

21          The defendant shall not access or attempt to

22   access the Internet by any means without the approval

23   of his probation officer.

24          The defendant shall not utilize e-mail in any

25   form or by any means without the approval of his

1        probation officer.

2                 The defendant shall also comply with all the

3        special conditions of supervision imposed in the

4        original Judgment dated September 28th, 2005.

5                 Miss McFadden, are you aware of any reason

6        why this sentence should not be imposed as previously

7        read and stated by the Court?

8                 MS. McFADDEN:  Obviously, Your Honor, we

9        object to the sentence being beyond the Guideline range

10       --

11                THE COURT:  Other than the fact that you

12       disagree with the sentence?

13                MS. McFADDEN:  Other than the fact that I

14       disagree, no, Your Honor.

15                THE COURT:  Okay.  Thank you, Miss McFadden.

16                Mr. Atchley, are you aware of any reason why

17       this sentence should not be imposed as previously read

18       and stated by the Court?

19                MR. ATCHLEY:  No, sir.

20                THE COURT:  Mr. Phillips, the Court finds

21       that under the circumstances of this case, considering

22       all of the violations, the number of violations that

23       exist in this case, and considering the fact that I

24       find you to be a clear and present danger to children,

25       underage children, in the community, I find that the

1   sentence imposed by this Court is sufficient but not

2   greater than necessary to carry out the purposes of 18

3   U.S.C. Section 3553(a).

4        Now, Mr. Phillips, you have a statutory right

5   to appeal your sentence under certain circumstances,

6   particularly if you think the sentence is contrary to

7   law.

8        You also have the right to apply for leave to

9   appeal on what is called In Forma Pauperis; that is,

10  without paying any Court costs prior to actually filing

11  your appeal.

12       If you request, the Clerk of this Court can

13  prepare and file a Notice of appeal on your behalf.

14       In addition, Mr. Phillips, with very few

15  exceptions, any Notice of Appeal must be filed within

16  10 days of the entry of the Judgment in this case.

17       The Judgment shall be promptly prepared with

18  the forms prescribed in Judgments, including sentences

19  under the Sentencing Reform Act.

20       This Court is adjourned.

21       THE COURTROOM DEPUTY:  All rise.  Court

22  stands adjourned.

23       (End of Proceedings.)

24

25

1                    REPORTER'S CERTIFICATE

2      STATE OF TENNESSEE      )

3      COUNTY OF KNOX          )

4              I, Lynda L. Clark, Court Reporter and Notary

5      Public, in and for the County of Knox, State of

6      Tennessee at large, do hereby certify:

7              That I reported stenographically the proceedings

8      held in open court on March 28, 2008, IN THE MATTER OF

9      UNITED STATES OF AMERICA VS. GREGORY ALEC PHILLIPS;

10     that said proceedings in connection with the hearing

11     were reduced to typewritten form; and that the

12     foregoing transcript is a true and accurate record of

13     said proceedings to the best of my knowledge, skills

14     and ability.

15             I further certify that I am not kin to any of

16     the parties involved therein, nor their counsel, and I

17     have no financial or otherwise interest in the outcome

18     of these proceedings whatsoever.

19             This the 5th day of March, 2008.

20

21             _____

22             COURT REPORTER & NOTARY PUBLIC

23             My Commission Expires:  08/24/11.

24

25

26